IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| YOUR INSURANCE GROUP, <br><br> Plaintiff, <br><br> vs. <br><br> INTEGRITY FIRST LEADS & MARKETING; DARLENE STEPHENS; And ADAM GARRETT <br><br> Defendants. | CASE NO. _____ <br><br> JURY TRIAL DEMANDED |

## COMPLAINT FOR DAMAGES

Plaintiff Your Insurance Group ("YIG") hereby files this Complaint, alleging as follows:

### THE PARTIES

1. Plaintiff YIG is a Florida Limited Liability Company with its principal place of business in Melbourne, Florida, and an office in Rockville, Maryland. No member of the LLC is a resident of Georgia.

2. Defendant Integrity First Leads ("IFL") is a Georgia corporation with its principal place of business in the State of Georgia.

3. Defendant Darlene Stephens is the Chief Executive Officer and the Chief Financial Officer of IFL. Ms. Stephens resides in La Grange, Georgia and is a

citizen of the State of Georgia.

4. Defendant Adam Garrett is the Secretary of IFL. Mr. Garrett resides in West Point, Georgia and is a citizen of the State of Georgia.

## JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1332 because the parties are citizens of different States (¶¶ 1–4 *supra*), and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs (¶ 59, *infra*).

6. This Court has personal jurisdiction over Defendant IFL because IFL is a Georgia Corporation with its principal place of business in the State of Georgia.

7. This Court has personal jurisdiction over Defendant Darlene Stephens because she is a citizen of the State of Georgia.

8. This Court has personal jurisdiction over Defendant Adam Garrett because he is a citizen of the State of Georgia.

9. Venue is proper in this District under 28 U.S.C. § 1391. Parts of the events giving rise to these claims occurred in this District, and Defendants are subject to personal jurisdiction in this District.

## GENERAL ALLEGATIONS

A. YIG's Business Model

10. YIG is an independent marketing organization (IMO) that specializes in

supporting licensed insurance agents.

11. IMOs, including YIG, do not underwrite or issue insurance policies; rather they act as a liaison between independent contractor insurance agents and their businesses agencies on the one hand and insurance carriers on the other hand.

12. Agents and agencies generally do not have the resources or connections that IMOs do.

13. IMOs, including YIG, offer resources including, but not limited to, training, marketing, leads, contracting, and recruiting to agents and agencies.

14. IMOs, including YIG, receive commissions when independent agents and agencies sell insurance policies.

15. YIG in particular specializes in providing direct mail leads to agents and agencies at a national set cost.

16. "Leads" generally consist of contact information for individuals who requested information about certain insurance policies.

17. Agents and agencies may choose to affiliate with YIG to obtain their leads.

18. Agents and agencies then use these leads to sell insurance policies, which generates commissions for YIG.

**B. IFL's Business Model**

19. IFL is a corporation that specializes in generating leads to sell to IMOs.

It is known as a "lead vendor."

20. IFL generates leads by mailing leaflets that solicit information from consumers about their interest in buying an insurance policy.

21. These leaflets provide individuals with the opportunity to fill out a form requesting more information about insurance policies.

22. Recipients of the leaflets mail the leaflet back to IFL if and once they fill the leaflet out.

23. The leaflets that are then returned to IFL with consumer information are referred to as "direct mail leads."

### C. YIG's & IFL's Business Relationship

24. Since 2015, YIG and IFL have had an exclusive business whereby YIG is IFL's sole customer.

25. Throughout the parties' relationship, YIG depended on IFL to generate and sell it direct mail leads, which agencies and agents associated with YIG would subsequently use to sell insurance policies.

26. Throughout the parties' relationship, YIG purchased direct mail leads from IFL at a fixed cost per lead, via purchase orders.

27. When an insurance agent or agency placed an order for a batch of leads from YIG, Graig Sadek, Vice President of Lead Development at YIG, would email Adam Garrett and/or Darlene Stephens of IFL to inquire as to whether IFL had the

capacity to fulfill the order.

28. Once IFL confirmed that they were able to fulfill the order, YIG would accept and process the order from the agent or agency.

29. Throughout the parties' relationship, IFL would send YIG an invoice to Mr. Sadek on a Monday evening, for the full amount of the previous week's lead orders, with payment due upon receipt.

30. Through the parties' relationship, YIG would pay for the leads before it received them from IFL.

31. When IFL accepted an order for a batch of leads from YIG, it would determine how many leaflets it must mail out to fulfill the order.

32. According to the parties' agreement, IFL would increase the size of its bulk mailing in order to satisfy YIG's preapproved and prepaid order in full.

33. According to the parties' agreement, YIG was required to purchase the full quantity of leads generated by IFL, even if the quantity was more than YIG specified it wanted to purchase.

34. Throughout the parties' relationship, IFL would deliver the leads to YIG twice a week, on Tuesdays and Thursdays.

35. For nearly six years, IFL performed its contractual obligations without issue.

36. For example, in 2018 and in 2019, IFL delivered more leads that YIG

5

ordered, which YIG subsequently purchased.

### D. IFL Falls Short of Its Contractual Obligations

37. However, beginning in 2020, IFL began falling short of its contractual obligations.

38. In the year 2020, YIG ordered and paid for 184,617 leads.

39. IFL, however, provided YIG with only 171,524 leads.

40. IFL failed to provide 13,093 leads that YIG had purchased. In other words, IFL did not provide 7.09% of the leads YIG had purchased.

41. In the year 2021, YIG ordered and paid for 450,755 leads.

42. IFL, however, provided YIG with only 425,944 leads.

43. IFL failed to provide 24,811 leads that YIG had purchased. In other words, IFL did not provide 5.5% of the leads YIG had purchased.

44. IFL's failures to fulfill its contractual obligations has escalated since December of 2021.

45. Between December 2021 and now, IFL failed to deliver 37,319 leads that YIG purchased.

46. YIG prepaid $964,459 for these 37,319 leads that it never received.

### E. The Parties' Relationship Further Deteriorates in February 2022 after Ms. Stephens Blatantly Lies to YIG, Destroys Mailers, and Disappears with Mr. Garrett

47. In February 2022, the parties discussed the escalating shortfalls.

48. Ms. Stephens blamed the United States Postal Service ("USPS"), stating that she intended to file a complaint.

49. YIG executives requested that Ms. Stephens provide documentation from USPS to confirm that she did, in fact, mail out enough leaflets in order to generate a quantity of leads that would satisfy her contractual obligations.

50. Ms. Stephens agreed to provide such documentation.

51. To date, Ms. Stephens has failed to provide documentation of her efforts to satisfy her contractual obligations.

52. On information and belief, Ms. Stephens invented the story about the USPS to deflect the blame.

53. After those conversations, one of YIG's associated insurance agents in Georgia visited Defendants' offices on a couple of occasions.

54. On each of those occasions, when this associate arrived at the office at 3683 Whitesville Road, Lagrange, GA 30240, there was nobody there.

55. Further, this associate observed a notice suggesting that phone lines would be disconnected, and he also saw what appeared to be moving trucks in the parking lot.

56. This associate further learned that approximately three weeks ago, a bulk mailing of lead mailers was returned to Ms. Stephens for failure to post them correctly.

57. YIG had paid for the postage associated with this mailing.

58. This associate further learned that rather than re-mail the mailers or inform YIG what happened, Ms. Stephens instructed her employees to destroy the returned mailers.

59. Since Thursday March 3, 2022, Defendants have refused to answer any of YIG's efforts at outreach.

60. Defendants have ignored multiple phone calls and text messages from YIG.

61. The last time that YIG received a distribution of leads from IFL was Thursday March 3, 2022, despite that the next batch was due on March 8, 2022.

### F. Defendants' Actions Have Caused YIG to Suffer Harm

62. To date, IFL owes YIG 91,127 leads, at a total value of $3,105,161. This value represents goods that IFL agreed to supply for a set fee, and for which IFL has already accepted payment.

63. IFL also owes YIG the cost of mailing the lead mailers that were returned to sender and not sent to the recipient.

64. Because IFL did not fulfill YIG's orders, YIG was not able to provide these leads to the independent agents and agencies who relied on them and had pre-paid YIG for them.

65. Because the agents and agencies did not receive these leads, they were

unable to sell insurance policies that YIG would have otherwise received a commission on.

66. Many of these agents and agencies grew impatient with YIG and demanded a refund and/or have stopped associating with YIG.

67. YIG has issued several refunds in connection with the leads it could not provide as a result of Defendants' failures.

68. YIG also lost out on commissions it would have obtained had agencies and agents continued to associate with it.

## COUNT I

### (Fraud)

69. YIG incorporates and realleges ¶¶ 1 through 68 above as if fully set forth herein.

70. Defendants falsely represented to YIG that they would fulfill all lead orders for which YIG paid for upfront.

71. Defendants falsely represented that they were unable to satisfy certain lead orders in full due to problems with the United States Postal Service.

72. Defendants falsely represented that they would provide YIG with documentation of all recent and past mailings.

73. On information and belief, Defendants made these false statements with the knowledge that such statements were false at the time they were made.

74. On information and belief, Defendants told these falsehoods to deceive YIG.

75. YIG justifiably and detrimentally relied on Defendant's falsehoods by continuing to order and pay for leads until as recently as last week.

76. YIG suffered damages in the amount of, at least, $3,105,161, in the form of leads for which YIG prepaid that were never delivered.

77. YIG suffered damages in connection with the postage costs associated with mailers that were returned to sender.

78. YIG suffered further monetary damages when its associated agents and agencies demanded refunds, which YIG then paid.

79. YIG also suffered monetary damages in the form of a significant loss of business and commissions from those agents and agencies who associate with YIG and depend on it to provide leads, which they subsequently use to generate commissions for YIG through the sale of insurance policies.

80. YIG also suffered damages when it attempted to rectify the situation by spending time and resources trying to contact IFL and in filing this lawsuit.

## COUNT II

### (Breach of Contract)

81. YIG incorporates and realleges ¶¶ 1 through 80 above as if fully set forth herein.

82. The parties agreed to the terms of the contract, whereby YIG pre-paid a fixed price per lead and IFL would deliver the leads to YIG on Tuesday and Thursday of every week.

83. Defendants breached the contract in failing to deliver 91,127 leads that YIG purchased.

84. Further, Defendant is in breach for failing to deliver any leads at all in the past week.

85. YIG suffered damages in the amount of, at least, $3,105,161, in the form of leads for which YIG prepaid that were never delivered.

86. YIG also suffered damages in connection with the postage costs associated with mailers that were returned to sender.

## COUNT III

### (Promissory Estoppel)

87. YIG incorporates and realleges ¶¶ 1 through 86 above as if fully set forth herein.

88. Defendants made a promise that they would deliver the quantity of leads ordered by YIG, with distribution on Tuesday and Thursday of each week.

89. Plaintiff and Defendants had a longstanding exclusive business relationship and, as such, Defendants reasonably should have expected that Plaintiff would rely upon that promise of delivery of leads.

11

90. Plaintiff suffered damages in the amount of, at least, $3,105,161, in the form of leads for which Plaintiff prepaid that were never delivered.

91. YIG also suffered damages in connection with the postage costs associated with mailers that were returned to sender.

92. YIG suffered further monetary damages when its associated agents and agencies demanded refunds, which YIG then paid.

93. YIG also suffered monetary damages in the form of a significant loss of business and commissions from those agents and agencies who associate with YIG and depend on it to provide leads, which they subsequently use to generate commissions for YIG through the sale of insurance policies.

94. YIG also suffered damages when it attempted to rectify the situation by spending time and resources trying to contact IFL and in filing this lawsuit.

95. Injustice can be avoided only by enforcing the promise because Plaintiff forwent valuable rights.

## COUNT IV

## (Unjust Enrichment)

96. YIG incorporates and realleges ¶¶ 1 through 95 above as if fully set forth herein.

97. Defendant induced or encouraged Plaintiff to provide monetary value in the form of pre-payment for leads ordered from Defendants and in the form of pre-

payment for mailing costs.

98. YIG provided a benefit to Defendants in the form of pre-payment for mailing costs and leads ordered with the expectation that Defendants would be responsible for the cost thereof.

99. Defendants knew of the benefits being bestowed on it by YIG and either affirmatively chose to accept the benefits or failed to reject them.

100. YIG suffered damages in the amount of, at least, $3,105,161, in the form of leads for which Plaintiff prepaid that were never delivered.

101. YIG also suffered damages in connection with the postage costs associated with mailers that were returned to sender.

102. Injustice can be avoided only by enforcing the promise because Plaintiff forwent valuable rights.

## JURY TRIAL DEMAND

YIG demands a trial by jury on all issues so triable as a matter of right and law.

## PRAYER FOR RELIEF

WHEREFORE, YIG respectfully requests the following:

A. That the Court enter judgment in favor of YIG on all causes of action;

B. On all causes of action, an award of damages in an amount to be

determined at trial;

  C. This case be tried by a jury;

  D. On all claims of relief, an award of YIG's reasonable attorneys' fees, pre-judgment and post-judgment interest, costs and the expenses of this action; and

  E. On all claims for relief, for such other, further and different relief as this Court deems just and proper.

Dated: March 11, 2022    Respectfully submitted,

              **KING & SPALDING LLP**

              */s/ Andrew Whittaker*
              Andrew Whittaker
              Georgia Bar No. 848023

              1180 Peachtree Street, N.E.
              Atlanta, Georgia 30309-3521
              Tel: (404) 572-4600
              Fax: (404) 572-5138
              awhittaker@kslaw.com

              *Attorney for Plaintiff Young Insurance Group*